UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL GRIFFIN,

         Plaintiff,

v.

CITY OF FLINT; GENESEE COUNTY;
TERRY COON; DAVID FORSTEYK;
GERALD PARKS; SAMANTHA O'BROIN;
BRIAN NOLAN; GREGORY CASEY;
ALLECIA WILSON; BRIAN HUNTER;
HURLEY MEDICAL CENTER

         Defendants.

Case No.  25-13615
Judge:

_____

SHEREEF H. AKEEL (P54345)
ADAM S. AKEEL (P81328)
DANIEL W. CERMAK (P84460)
Akeel & Valentine, PLC
*Attorneys for Plaintiff*
888 W. Big Beaver Rd., Ste. 350
Troy, MI 48084-4736
(248) 269-9595
shereef@akeelvalentine.com
adam@akeelvalentine.com
daniel@akeelvalentine.com

_____

## PLAINTIFF'S COMPLAINT

**NOW COMES** Plaintiff, Michael Griffin, by and through his undersigned

counsel, AKEEL & VALENTINE, PLC, and for his Complaint against Defendants,

states as follows:

## INTRODUCTION AND NATURE OF THE ACTION

1.    This case arises from the wrongful conviction of Michael Griffin, a devoted nineteen-year-old father whose life was destroyed when police officers, doctors, and forensic officials in Flint and Genesee County conspired to transform a tragic household accident into a fabricated homicide. In 2009, Mr. Griffin's seven-month-old daughter, Naviah, fell from her swing and later died following a failed surgical procedure. Rather than search for truth, investigators and medical personnel built a false narrative of abuse, coercing a confession through fear and deceit, falsifying police and medical reports, and altering autopsy findings to match their story. Based on this manufactured evidence, Mr. Griffin, an African American male from Flint, MI, was convicted of crimes he did not commit and spent fourteen years in prison before his exoneration in 2023. This action seeks to hold accountable those responsible—the City of Flint, Genesee County, and the officials and physicians who traded truth for conviction and justice for convenience.

2.    This is a civil rights and wrongful conviction action brought under 42 U.S.C. § 1983 and Michigan common law. Plaintiff seeks redress for the violations of his Fourth, Fifth, and Fourteenth Amendment rights resulting from his unlawful arrest, malicious prosecution, wrongful conviction, and false imprisonment based on fabricated evidence, false medical testimony, and a coerced confession obtained through psychological manipulation.

3.     In September 2009, Naviah was brought to Hurley Medical Center after she appeared injured from a fall out of her swing. What began as a medical emergency due to an accidental fall quickly devolved into a criminal investigation when Hurley doctors, Flint police officers, and Genesee County forensic staff discovered complications in Naviah's care that substantially increased the risk of malpractice liability.

4.     Without medical basis or probable cause, Defendants Coon and Forsteyk, officers of the Flint Police Department, together with Hurley physicians Casey, Nolan, O'Broin, and Genesee County medical-examiner officials Wilson, Hunter, and Parks, manufactured a false narrative of abuse. They generated fabricated police reports, hospital notes, and autopsy findings that parroted one another in a circular scheme to ensure Plaintiff's conviction.

5.     During a late-night custodial interrogation, Detectives Coon and Forsteyk isolated Plaintiff, denied him counsel, and told him that unless he admitted to intentionally harming his daughter, doctors would refuse to treat her, and Defendants would seek to terminate his parental rights. Under extreme emotional duress, Plaintiff made confused, involuntary statements, which Defendants later distorted into written confessions. The original video and audio recordings of that interrogation were then concealed or destroyed.

6. Meanwhile, Hurley doctors and Genesee County forensic personnel—rather than acting independently—manufactured and altered medical and autopsy records to fit the police narrative. Defendant Wilson, the County Medical Examiner, ultimately issued two conflicting autopsy reports: one listing "Blunt Force Trauma" and another changing the cause of death to "Abusive Head Trauma." The second autopsy report was sent to the prosecution during Plaintiff's criminal trial and after the prosecution's main witnesses admitted to not having any evidence to support the first autopsy's conclusion of "Blunt Force Trauma".

7. These reports ignored evidence that Naviah's fatal injury occurred during a botched craniotomy and that she suffered from a pre-existing cystic hygroma, which made her especially susceptible to re-injury.

8. On the strength of the coerced confession and falsified medical and police evidence, prosecutors charged Plaintiff with First-Degree Child Abuse and Felony Murder. At no point prior to, or after, Plaintiff's arrest did probable cause exist for the charges brought against Plaintiff.

9. In 2010, Plaintiff was wrongfully convicted and sentenced to life in prison. For approximately fourteen years, Plaintiff lived under the stigma and suffering of a crime he did not commit—until 2023, when the Michigan Innocence Clinic and Mike Morse Law Firm discovered the falsified evidence and violations of Plaintiff's due process rights and secured his complete exoneration.

10.    Plaintiff now brings this action to vindicate his constitutional rights and to hold accountable the police officers, medical professionals, forensic officials, and municipalities whose collective misconduct caused one of the most grievous known-miscarriages of justice in Michigan's recent history.

11.    Through this suit, Plaintiff seeks compensation for the years of liberty lost, the irreparable emotional and reputational harm suffered, and to ensure that no family or community ever endures again the consequences of such systemic abuse of power.

## JURISDICTION & VENUE

12.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

13.    This Court has personal jurisdiction over the named Defendants because they either reside in the State of Michigan and/or do systematic and continuous business in Michigan.

14.    Venue lies in the Eastern District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district and because all named Defendants reside in this district.

## **PARTIES**

15.    Plaintiff, Michael Griffin, is a citizen and resident of the State of Michigan. He was wrongfully arrested, maliciously prosecuted, wrongfully convicted, and falsely imprisoned for approximately fourteen years for crimes he did not commit. Mr. Griffin was exonerated and released from custody in 2023 after the discovery of fabricated and falsified evidence used to convict him.

16.    Defendant Sgt. Terry Coon was, at all relevant times, a sworn officer and Sergeant of the Flint Police Department, with approximately 21 years' service at the time of Plaintiff's trial. Sgt. Coon conducted and supervised the investigation into Plaintiff, participated directly in the custodial interrogation of Plaintiff, and engaged in the fabrication and mischaracterization of reports and evidence used to falsely arrest and maliciously prosecute Plaintiff. He is sued in his individual and official capacities.

17.    Defendant Sgt. David Forsteyk was, at all relevant times, a Sergeant in the Flint Police Department. Sgt. Forsteyk participated in the interrogation of Plaintiff, authored and supervised preparation of false or misleading reports, omitted exculpatory facts, and misrepresented Plaintiff's statements to investigators and prosecutors. He is sued in his individual and official capacities.

18.    Defendants Coon and Forsteyk, as sworn officers of the Flint Police Department, were acting under the supervision and command of the City of Flint.

6

Their investigative activities, custodial interrogation of Plaintiff, and preparation of official reports were performed in the course of their employment and pursuant to Flint Police Department authority and policy.

19. Defendant Detective Sgt. Gerald Parks was, at all relevant times, a Detective Sergeant with the Genesee County Sheriff's Office, beginning his service in 1981. Sgt. Parks led or assisted the death-scene investigation and reporting in Plaintiff's case, and has a history of engaging in coercive and abusive tactics in death-investigation cases. Public records reflect that Parks retired in 2012 and he was subsequently criminally charged for abusing an inmate. He is sued in his individual and official capacities.

20. Defendant Gerald Parks, as a Detective Sergeant with the Genesee County Sheriff's Office, acted within the course of his employment, and under the authority of the County and its law-enforcement chain of command. His investigative and reporting duties were conducted pursuant to county policies and in coordination with the Flint Police Department and the Genesee County Medical Examiner's Office.

21. Defendant Dr. Samantha O'Broin, M.D., was at all relevant times a Clinical Instructor of Emergency Medicine and an Emergency Physician at Hurley Medical Center in Flint. She participated in the clinical evaluation of the decedent, communicated misleading findings to law-enforcement personnel, and

manufactured false evidence in furtherance of the unlawful conspiracy. She is sued in her individual and official capacities.

22.     Defendant Dr. Brian Nolan, M.D., was at all relevant times employed by Hurley Medical Center for over 30 years, and during the relevant period served as Director of Pediatrics. Dr. Nolan reviewed imaging and clinical data, approved or contributed to records concluding intentional injury, and participated in the transfer of falsified medical findings to law enforcement. He is sued in his individual and official capacities.

23.     Defendant Dr. Gregory Casey, M.D., was at all relevant times a trauma surgeon at Hurley Medical Center, with approximately 4-5 years in the role at the time of Plaintiff's trial. Dr. Casey participated in the care of the infant decedent, provided or approved hospital documentation falsely labeling the injury as abuse, and coordinated with detectives in furtherance of the conspiracy's unlawful objectives. He is sued in his individual and official capacities.

24.     Defendants Samantha O'Broin, Brian Nolan, and Gregory Casey were acting under color of state law as agents, employees, or contractors of Hurley Medical Center, a publicly owned and city-operated teaching hospital functioning as an instrumentality of the City of Flint. During the events at issue, these Defendants unlawfully conspired with law enforcement in a joint investigation of an alleged

criminal act, conducted within a governmental setting and pursuant to hospital policies requiring collaboration with police.

25.     Defendant Allecia Wilson, M.D., was at the time of the incident a Deputy Medical Examiner at the Genesee County Medical Examiner's Office, with approximately 2 years in that role. Dr. Wilson supervised, reviewed, or approved autopsy reports in Plaintiff's case, issued conflicting cause-of-death findings, and cooperated with law-enforcement and prosecutorial narratives of homicide rather than medical causation. She is sued in her individual and official capacities.

26.     Defendant Dr. Brian Hunter, M.D., was at the time of the incident employed at the Genesee County Medical Examiner's Office (as a forensic medical examiner or deputy). Dr. Hunter participated in the autopsy and contributed to or approved the falsified forensic findings that formed the evidentiary basis for Plaintiff's criminal prosecution. He is sued in his individual and official capacities.

27.     Defendants Allecia Wilson and Brian Hunter were acting under color of state law as forensic pathologists and medical examiners employed by or contracted with the Genesee County Medical Examiner's Office, a division of Genesee County government. Their autopsy, reporting, and testimony were official governmental functions performed pursuant to statutory authority and county policy.

28.    Defendant Hurley Medical Center ("Hurley") is a hospital located in Flint, Michigan. Hurley operates a 457-bed regional medical and Level I trauma facility.

29.    At all relevant times, Hurley acted under color of state law and, through its agents, employees, and contractors—including Defendants O'Broin, Nolan, and Casey (collectively referred to as the "Hurley Medical Defendants")—participated jointly with law-enforcement and medical-examiner personnel in the fabricated investigation that resulted in Plaintiff's false arrest, malicious prosecution, and wrongful conviction.

30.    Hurley is sued under 42 U.S.C. § 1983 and Michigan law for its policies, customs, and deliberate indifference in failing to train, supervise, and discipline its physicians and staff regarding the constitutional and ethical limits of cooperation with law enforcement during criminal investigations involving alleged child abuse or homicide.

31.    Defendant City of Flint is a municipal corporation organized under the laws of the State of Michigan. The City of Flint operated and controlled the Flint Police Department, which was responsible for investigating the incident leading to Plaintiff's false arrest, malicious prosecution, and wrongful conviction. The City is responsible for the policies, customs, and practices governing its police officers and detectives, including Defendants Coon and Forsteyk. The City is liable for the

10

maintenance of unconstitutional policies and customs that caused Plaintiff's constitutional deprivations.

32.    Defendant Genesee County is a municipal corporation organized under the laws of the State of Michigan. Genesee County operated and controlled the Genesee County Medical Examiner's Office and employed or contracted with Defendants Wilson, Hunter, and Parks. The County is responsible for the policies, customs, and training or supervision of its death-investigation personnel. It is liable for maintaining or enforcing policies, customs, and practices that were the moving force behind Plaintiff's constitutional injuries.

33.    At all relevant times, each of the individual Defendants was acting under color of state law within the meaning of 42 U.S.C. § 1983, exercising authority derived from their positions as law-enforcement officers, physicians employed by or contracted with a public hospital, or forensic personnel employed by a county medical examiner's office.

34.    At all times relevant, the individual Defendants' acts and omissions were performed in the course of their employment or contractual relationships with their respective municipal or institutional employers—the City of Flint, Hurley Medical Center, and Genesee County—and were taken in furtherance of an unlawful conspiracy to deprive Plaintiff of his constitutional rights.

35.     Accordingly, the City of Flint, Hurley Medical Center, and Genesee County are each responsible for the policies, customs, and deliberate indifference that enabled and encouraged the unlawful acts and omissions of their employees and agents.

## COMMON ALLEGATIONS

36.     On February 9, 2009, Plaintiff welcomed his baby daughter ("Naviah") into the world. It was one of the happiest days of his life.

37.     At the time of Naviah's birth, both Plaintiff and Naviah's mom ("Mom") were 19 years old and unemployed.

38.     Plaintiff dropped out of school in eleventh grade.

39.     With Naviah's birth, Mom and Plaintiff moved into a two-story apartment to raise their daughter together.

40.     Mom eventually obtained a job which required her to be away from the house for periods of time throughout the week.

41.     While Mom was at work, Plaintiff was Naviah's primary caretaker. Plaintiff loved being a father to, and caring for, Naviah.

42.     Plaintiff was one of very few people Mom trusted to be alone with Naviah.

43.     In March of 2009, while Mom was away, Plaintiff was caring for Naviah. While Naviah was lying on the couch, Plaintiff went to the restroom. When

he returned, he found Naviah on the floor. Naviah did not appear to be injured; however, in the abundance of caution, Mom took Naviah to Hurley Medical for evaluation. Hurley Medical was informed that Naviah had fallen, and she was evaluated for a head injury. Naviah's CT scan did not show any brain injury, and no other injuries were found.

44.     On September 30, 2009, Plaintiff and Mom were at home with Naviah. Naviah was approximately 7 months old at the time.

45.     At approximately 5:00 p.m., Mom left the house.

46.     While Mom was away, Plaintiff was playing video games downstairs while Naviah was in her infant swing upstairs. [**Ex. A** – Picture of Infant Swing].

47.     Naviah appeared to enjoy being in her infant swing which contained two forms of restraint: (i) a tray that latched down across Naviah's lap and (ii) seatbelts.

48.     Prior to this day, Naviah had successfully kicked up the latched tray and pulled herself up and out of the swing by grabbing onto the toys that were dangling in front of her but secured to the swing.

49.     In fact, Naviah had successfully pulled herself out of the swing on at least 2-3 occasions, one of which occurred a week or two prior to September 30th.

50.     Because of this, Mom and Plaintiff both made a conscious effort to remember to ensure that Naviah was secured in the swing with both the latched tray

*and* the seatbelts; however, admittedly, Plaintiff would sometimes forget to secure Naviah with the seatbelts.

51.    On September 30, 2009, Naviah was in her swing and secured by the latched tray, but not with the seatbelts.

52.    While Plaintiff was downstairs playing video games, he heard a loud thump that seemed to have come from Naviah's room or from the apartment next door.

53.    Plaintiff immediately went upstairs to check on Naviah and found her face down on the hardwood floor.

54.    Plaintiff recalls Naviah attempting to cry and when he picked her up he noticed that she appeared to be having a seizure.

55.    Plaintiff placed Naviah on his bed and noticed that her eyes were rolling back.

56.    Plaintiff then heard knocking at the door – Mom had just returned – and he picked up Naviah. When he picked up Naviah, she appeared to stop breathing and her head fell on his shoulder.

57.    Carrying Naviah, Plaintiff ran to the door and frantically told Mom that Naviah was not breathing.

58.    Mom took Naviah and ran out the front door screaming for help.

59.     A security officer took Naviah from Mom and began doing CPR. Fortunately, the security officer was able to resuscitate Naviah. This occurred between 6:30 p.m. and 6:40 p.m.

60.     According to the security officer, during this time Plaintiff was very upset and crying.

61.     According to Plaintiff's mom, Plaintiff had called her crying and panicking because he was worried about Naviah's well-being.

62.     According to police and ambulatory records, emergency personnel were dispatched to the home at approximately 6:36 p.m.

63.     By the time the paramedics arrived, Naviah was breathing again.

64.     Emergency personnel observed a bruise on Naviah's eye but no other external injuries.

65.     According to ambulatory records, Naviah was taken to Hurley Medical at 6:48 p.m. and arrived at 6:55 p.m.

66.     Upon admission, Plaintiff was admitted under the care of Dr. Gregory Casey (Trauma Physician), Dr. Brian Nolan (Pediatric Physician), and Dr. Samantha O'Broin (Emergency Physician)

67.     Despite the existence of hospital records showing that Naviah had previously been admitted for a prior head injury, admission records stated that Naviah had no prior medical history.

68.     Hospital records initially stated that Naviah's injuries were due to an *accidental* fall from a swing.

69.     Hospital records initially stated that Naviah had no observable injuries other than an approximately 1 x 1 centimeter area of *purplish* appearing ecchymosis over the right cheek just superior to the orbit. However, subsequent records (generated after Naviah's death) stated that this ecchymosis was "pale".

70.     Hospital records initially stated that Naviah appeared healthy, well-nourished, and not in acute distress.

71.     Hospital records stated that Naviah appeared to have irregular respiratory efforts.[1]

72.     Hospital records initially stated that there was periorbital swelling that was noted, but no other exterior injuries or injuries to Naviah's eyes.

73.     Hospital records initially stated that there were no other exterior injuries, swelling, or abrasions to Naviah.

74.     Hospital records initially stated that there was no evidence of trauma to Naviah's extremities.

---

[1] Naviah had been previously diagnosed with asthma and, in addition to being subjected to the heroic but exhausting life-saving measures of the security officer, hospital records reflect multiple invasive procedures conducted in route to, and at the hospital. Hospital records reflect at least one failed attempt at placing an IV, and subsequent attempts thereafter, in addition to intubation procedures. At various points, hospital records reflect that Naviah appeared exhausted and her eyes were sluggish.

75.    As of 7:40 p.m., hospital records indicate that medical personnel had no reason to suspect Naviah's injuries were caused by abuse.

76.    Rather, hospital records initially, and consistently, stated that the injuries were caused due to an *accidental* fall from a swing.[2]

## Doctors Discover a Cystic Hygroma and Conspire to Manufacture Evidence Against Plaintiff

77.    At approximately 7:45 p.m., a CT scan was administered on Naviah's head.

78.    The CT scan revealed a "very small", "tiny" and "thin" bleed on the *left* side of Naviah's brain.

79.    The trauma surgeon, Casey, noticed the existence of a cystic hygroma on the *right* side of Naviah's brain, meaning that a prior head injury had occurred, had healed, but was dangerously susceptible to reinjury. In other words, the existence of a cystic hygroma, and well-known associated risks, indicated the need for heightened care, monitoring and attention.

80.    The existence of a cystic hygroma is known to suggest that a subsequent head injury could cause exacerbation of a prior injury.

81.    Casey admitted that the cystic hygroma was very concerning to him, but that he relied on the neurosurgeon (Jawad Shah) to determine how to proceed.

---

[2] As will be discussed, subsequent hospital records (dated and signed after Naviah's death) changed the cause of injury from accidental to non-accidental.

82.    O'Broin similarly testified that she relied upon the neurosurgeon to determine how to proceed.

83.    But Shah never personally reviewed the CT scan at that time and did not personally visit Naviah until the following day.

84.    Shah, on the other hand, testified that he relied upon Casey and O'Broin to determine how to proceed.

85.    After discovery the existence of a cystic hygroma, the Hurley Medical Defendants contacted Child Protective Services and the Flint Police.

86.    At approximately 8:48 p.m., Officers Forsteyk and Coon arrived at the hospital.

87.    At 8:58 p.m., Casey entered an order for an emergent consultation with Shah.

88.    According to hospital records, the results of Naviah's CT scan were read to Shah over the phone.

89.    According to O'Brion, the neurosurgeon, Shah, was consulted over the phone and it was Shah that determined that surgery was not needed and Naviah should be taken to the pediatric ICU for monitoring.

90.    According to hospital records, at 9:04 p.m., Shah ordered a routine CT Scan of Naviah's head to be performed the next day at 5:30 a.m.

91.    Hospital records indicate that at 9:13 p.m., Shah ordered fentanyl dosages to be provided to Naviah via injections and neuro checks to be performed one hour prior to fentanyl injections.

92.    Hospital records indicate that, as of 10:15 p.m., Naviah was opening her eyes and moving all her limbs.

93.    According to police records, a doctor allegedly told Forsteyk that Naviah's injuries were "non-accidental and did not happen as described by father."

94.    Shortly thereafter, Coon and Forsteyk took Mom to the Criminal Investigations Bureau of the Flint Police Department.

95.    From approximately 10:07 p.m. to approximately 11:28 p.m., Coon and Forsteyk interrogated Mom.[3]

96.    During that interrogation, Mom told Coon and Forsteyk that the doctors had told Mom that they found evidence of an old injury to Naviah's head.

97.    Mom told the officers that she had a good relationship with Plaintiff and that Plaintiff treats her and Naviah well.

98.    Mom told the officers that she trusted Plaintiff and does not allow anyone to watch Naviah other than Plaintiff.

---

[3] The following allegations relating to this interrogation are based upon police records and abbreviated transcripts provided by Coon and Forsteyk to the prosecution and defense. The interrogation was recorded via video and audio, but those recordings were never provided to Plaintiff. Indeed, as of November 10, 2025, Flint denies the existence of such recordings.

99. Coon and Forsteyk questioned Mom about whether Plaintiff abused Mom and Naviah, to which Mom denied.

100. Mom informed the officers that she had no reason to believe Plaintiff would hurt Naviah, that Plaintiff had never assaulted her or Naviah, and that Plaintiff is very calm and does not become angry easily.

101. Mom also informed the officers that Naviah had a tendency to kick up the latched tray and pull herself up and out of her swing and that she had previously done so on multiple occasions.

102. Coon and Forsteyk criticized Mom for trusting Plaintiff, telling Mom that the doctors did not believe the story provided by Plaintiff, and that Mom needed to open her eyes because Coon and Forsteyk knew that Plaintiff abused Naviah and intentionally caused her injuries.

103. Coon and Forsteyk told Mom that the doctors were reporting Naviah's injury as non-accidental and told Mom that if she does not cooperate whatever happens to Naviah next time will be worse.

104. Mom maintained that Plaintiff did not abuse her or Naviah.

105. According to police records, Mom was interrogated until 11:28 p.m.

106. Mom was then taken back to the hospital where she was told by Hurley's doctors that Naviah was in stable condition and that she would be released the following day.

107. Coon and Forsteyk then took Plaintiff into custody for interrogation at the Criminal Investigations Bureau of the Flint Police Department.

108. Like Mom's interrogation, this interrogation was recorded via both audio and video, but Plaintiff was never provided a copy of that audio or video. As of November 10, 2025, Flint maintains that no such audio or video exists.

109. Given that Defendants withheld, concealed, and/or destroyed the video and audio recordings of Plaintiff's interrogation, the following allegations relating to this interrogation are based upon Forsteyk's and Coon's abbreviated transcription and police report, and confirmed by Plaintiff.

110. As a preliminary matter, while Plaintiff was purportedly told he was not under arrest, Plaintiff was not read any of his *Miranda* rights despite being in custody and accused by both Coon and Forsteyk for criminal conduct.

111. At the time, Plaintiff was (i) 19 years old; (ii) unemployed; (iii) a known high school dropout; (iv) without any form of transportation; (v) in custody, (vi) in a police-dominated interrogation room; (vii) in the middle of the night; (vii) alone; and (viii) while his 7-month-old daughter was in critical condition.

112. At the start of the interrogation, the officers closed the door.

113. Plaintiff was told that the purpose of the interrogation was to determine the cause of Naviah's injuries.

114.   Plaintiff was told that the doctors and the officers believed that Plaintiff had intentionally abused Naviah and caused her injuries.

115.   Plaintiff informed the officers that Naviah had fallen out of her swing while he was playing video games and that she was not strapped in her swing.

116.   Coon and Forsteyk repeatedly accused Plaintiff of lying, telling Plaintiff that the doctors knew that he caused the injuries and that if Plaintiff failed to admit to causing Naviah's injuries the doctors would not be able to treat Naviah.

117.   Coon and Forsteyk continued to tell Plaintiff that Naviah would die if Plaintiff did not confess to harming her and that if Plaintiff failed to tell the officers more, the officers and doctors would seek to terminate Plaintiff's parental rights.

118.   Coon and Forsteyk continued to accuse Plaintiff of lying and stated that Plaintiff needed to tell them something that would support their theory that blunt impact and/or shaking caused Naviah's brain bleed and that a fall from a swing was not sufficient.

119.   Plaintiff informed Coon and Forsteyk that just a couple of weeks prior Naviah had fallen on the metal post of the swing and there was a bruise and suggested that this could have happened again.

120.   Coon and Forystek would not relent and continued to accuse Plaintiff of lying, threatening to ensure that Plaintiff never gets near his daughter again, and telling Plaintiff that if he fails to give them more Plaintiff will lose his daughter in

one of two ways – either she'll die because he wasn't man enough to tell the truth or they'll work with the doctors to ensure that Plaintiff's parental rights are terminated.

121.   Coon and Forsteyk continued to tell Plaintiff that the clock was ticking, accused Plaintiff of intentionally delaying, and told Plaintiff that Naviah's life depended on Plaintiff telling them more.

122.   Coon and Forsteyk told Plaintiff that the doctors would not treat Naviah until Plaintiff admitted to more and threatened to call the doctors and tell them that Plaintiff did not care about his daughter.

123.   Coon and Forsteyk asked Plaintiff whether he was prepared to go to his daughter's funeral and regret not telling them more.

124.   Coon and Forsteyk told Plaintiff that Naviah needs her father to save her by telling them more.

125.   Coon and Forsteyk told Plaintiff that both they and the doctors believed he caused the injuries intentionally.

126.   Coon and Forsteyk told Plaintiff that they suspected he lost his temper with Mom and took it out on Naviah.

127.   Plaintiff continued to deny hurting Naviah in any way, and Coon and Forsteyk told Plaintiff that they were starting to believe he was a monster.

128. Coon and Forsteyk asked Plaintiff how he would feel if Naviah died and Plaintiff had to live with knowing that he could have saved her had he told the officers more to support their theory.

129. Coon and Forsteyk told Plaintiff that if Naviah dies, the doctors will take her brain out and look at it and they may determine that had Plaintiff told the officers more about how Naviah got injured the doctors could have saved her.

130. Plaintiff continued to tell the officers that he did not hurt Naviah and that she had fallen out of the swing, and the officers threatened that they would recommend that Plaintiff's parental rights be terminated.

131. Coon and Forsteyk told Plaintiff that Naviah needs her father to be her hero and save her life by telling them more.

132. Forsteyk told Plaintiff that he was too young to carry the burden of Naviah's death around for the rest of his life and he could clear it up if Plaintiff told him more.

133. Coon and Forsteyk accused Plaintiff of not wanting to help his daughter and told Plaintiff he could leave but threatened that Plaintiff would likely not be able to see Naviah again for at least 18 months.

134. Coon and Forsteyk accused Plaintiff of not wanting Naviah to live because of the burden she placed on him and told Plaintiff that the doctors would

stack their testimony against Plaintiff to win in the battle of explaining Naviah's
injuries (which later happened) and to ensure he loses his parental rights.

135.    Coon and Forsteyk admitted that the doctors were aware of an old head
injury.

136.    Coon and Forsteyk admitted to knowing that Plaintiff was tired but
stated that they wanted Plaintiff to tell them more because termination proceedings
were imminent and they wanted to avoid splitting up Plaintiff's family.

137.    Coon and Forsteyk told Plaintiff that Naviah was counting on him and
that Plaintiff should be scared because he was either going to lose his daughter to
death or through loss of parental rights.

138.    Plaintiff continued to maintain that he was telling the truth and that
Naviah's injury was caused by a fall out of her swing.

139.    Given the coercive pressure being placed on Plaintiff by Coon and
Forsteyk, and in a desperate attempt to satisfy the officers' relentless demands,
Plaintiff stated that he sometimes taps Naviah on the back of the head, but he never
does it hard and he plays with her that way. Plaintiff also told the officers that he
sometimes throws her up and down but also just to play with her and that he has
never and would never hurt her.[4]

---

[4] Defendants used these involuntary statements at trial and to justify falsely arresting
and maliciously prosecuting Plaintiff for felony murder and first-degree child abuse,

140.    Unsatisfied, Coon and Forsteyk continued accusing Plaintiff of lying and not wanting his daughter to survive.

141.    Coon and Forsteyk then made additional provocative statements to Plaintiff about Mom wanting to be with other men in order to elicit involuntary statements that Defendants then used to falsely arrest, maliciously prosecute, and wrongfully convict Plaintiff.

142.    According to police records, Plaintiff was interrogated for several hours until approximately 3 a.m. when he was taken back to the hospital by the officers.

143.    Coon and Forsteyk made handwritten and typed up abbreviated transcripts and police reports utilizing the involuntary statements and false confessions elicited under coercion during the unconstitutional interrogation so to further aid in the concerted effort to falsely arrest and maliciously prosecute Plaintiff.

## **Naviah Dies During a Failed Craniotomy and Defendants Continue to Take Overt Acts to Falsely Arrest and Maliciously Prosecute Plaintiff**

144.    In the early morning of October 1, 2009, Hurley Medical informed Plaintiff and Mom that Naviah would be released that day.

---

without probable cause. Defendants used these illegally elicited statements at trial to persuade a jury to convict Plaintiff for crimes he did not commit. These involuntary statements were also used by the prosecution to convince the court of appeals to affirm Plaintiff's conviction. *See, People v. Griffin,* 2011 WL 4952213 (Mich. Ct. App. 2011).

145.   Plaintiff went home and obtained clothes for Naviah.

146.   Neither Plaintiff nor Mom was provided any information relating to Naviah's well-being while at Hurley Medical.

147.   Neither Plaintiff nor Mom were permitted to see Naviah while at Hurley Medical.

148.   According to hospital records, at approximately 6:00 a.m. on October 1, 2009, a second CT scan of Naviah's head was conducted.[5]

149.   According to hospital records, the second CT scan allegedly revealed a significant *new* bleed on the *right* side of Naviah's brain.

150.   The radiologist report (dictated and signed after Naviah's death) indicated that between the first CT scan and the second CT scan a *new* subdural bleed occurred. The records characterize the new injuries as being caused by nonaccidental trauma.

151.   This is consistent with Shah's records which stated that the initial CT scan showed a "very small subdural hematoma" and at that time her functional level was good. But that "over the course of the night there was deterioration", which allegedly prompted the second CT scan.

---

[5] Other hospital records indicate that a second CT scan was conducted at 5:15 a.m.; however, elsewhere the records indicate that at 6:06 a.m. the 5:15 a.m. CT scan was cancelled with express instructions not to reorder.

152.   According to Shah's records, "given this deterioration [Naviah] was emergently rushed for surgery."

153.   At approximately 7:00 a.m., Plaintiff and Mom finally received an update from Hurley Medical relating to Naviah's well-being. They were informed that Naviah would be taken back for a 45-minute surgery. Plaintiff and Mom heard nothing further until approximately five hours later when they were told Naviah was brain dead and they were asked for consent to discontinue treatment.

154.   At trial Shah, testified that the first time he saw Naviah was during surgery – approximately 12 hours after Naviah was admitted to Hurley Medical.

155.   Hospital records relating to this surgery (many of which were generated after Naviah's death) are sloppy and inconsistent, but the following is what can be gleaned from them.

156.   Naviah was taken into surgery at approximately 7:30 a.m. on October 1, 2009. The purpose of the surgery was to allegedly remove a piece of Naviah's skull and remove a blood clot.

157.   Shah allegedly attempted to perform a craniotomy of Naviah from 7:48 a.m. until 10:53 a.m.

158.   Shah was unable to successfully perform the craniotomy and Naviah died during the craniotomy.

159.   Shah's notes on this procedure depicts a gruesome picture of a failed craniotomy, and it is undisputed that it was during this procedure that Naviah's died.

160.   During this procedure, Naviah's brain turned white as a result of a loss of blood and her brain herniated beyond control to the point where Shah was unable to put Naviah's brain back into her head.

161.   Defendants knew that Naviah died during this procedure and as a result of a failed craniotomy.

162.   During this procedure, Naviah went into cardiac arrest several times, as confirmed by hospital records generated by Shah, Nolan, and Casey.

163.   During this procedure, Naviah was deemed brain dead.

164.   Shah was never able to put Naviah's brain back in her skull, and the skull piece that Shah removed was placed in another part of Naviah's body.

165.   Meanwhile, as the failed craniotomy was being performed, hospital records indicate that O'Broin began transcribing medical records. O'Broin's records (which were modified by her on October 14, 2009) stated, without any evidence, that Naviah's injuries were a result of "non-accidental trauma" and that CPS and Flint Police were notified.

166.   Of note, O'Broin's notes also referenced the purplish ecchymosis over Naviah's eye.

167.    Hospital records show that by 9:10 a.m. arrangements were being made by Hurley Medical to donate Naviah's organs.

168.    Casey's notes indicate that he operated on Naviah from 10:35 a.m. until 12:15 p.m.

169.    Hospital records indicate that at 12:14 p.m. Casey requested that Nolan be contacted to see Naviah.

170.    Hospital records indicate that Naviah was taken to post-op at 12:23 p.m.

171.    Nolan's notes indicate that at approximately 12:55 p.m., Nolan spoke with Naviah's parents and obtained their consent to discontinue ventilation.

172.    Nolan pronounced Naviah dead at 1:10 p.m.

173.    Nolan's notes state that Wilson (pathologist) and Coon (officer) were contacted.

174.    According to Wilson, she was first contacted by Hurley Medical while Naviah's surgery was being conducted, and she was contacted again after Naviah was pronounced dead. Strangely however, Wilson later authored an Autopsy Report in which she alleged to have performed an autopsy on Naviah at 9:00 a.m. on October 1, 2009 – while the craniotomy was alleging being conducted. Wilson later testified that she conducted the autopsy of Naviah on the date and time reflected in her report.

175. At approximately 1:19 p.m., Wilson's investigator, Parks, was allegedly dispatched via Genesee County Dispatch to Hurley Medical.

176. According to a report authored by Parks and dated May 10, 2010 (6.5 months after Naviah's death and 2 months prior to Plaintiff's criminal trial), upon arrival Parks was informed that Naviah's CT scan revealed a right-side hematoma and a left side subdermal hematoma which was on top of an old injury.

177. Upon arrival, Nolan told Parks that Naviah's death should be considered a non-accidental death caused by Plaintiff.

178. Parks then made contact with Mom who told Parks that Naviah was brought into the hospital due to an accidental fall onto hardwood from a child's swing.

179. Parks then prepared handwritten notes stating that two hours later he spoke with Mom again and Mom had told Parks that Plaintiff had abused and killed Naviah. This was false and completely fabricated by Parks.

180. Parks regurgitated this fabricated evidence in his May 10, 2010 report, and in testimony at trial, but in both instances his accounting of that alleged interaction varied.

181. The fabricated evidence generated by Parks was then used by Defendants to falsely arrest, maliciously prosecute, and wrongfully convict Plaintiff.

182. The fabricated evidence generated by Parks was provided to Plaintiff shortly before his criminal trial.

183. That same day, on October 1, 2009, Forsteyk spoke with Genesee County Prosecutor, Tammy Phillips, in an attempt to bring charges against Plaintiff. Forsteyk was allegedly informed that an autopsy was needed first.[6]

184. Hospital records indicate that the following day, on October 2, 2009, Hunter entered an order for a post-mortem babygram of Naviah due to an unexpected death.

185. Despite Wilson's autopsy report stating that the autopsy occurred on October 1, 2009, at 9:00 a.m., and despite Wilson's testimony that the post-mortem babygram was the first step performed in her autopsy, hospital records indicate that that the post-mortem babygram did not occur until the afternoon of October 2, 2009.

186. Meanwhile a Medical Examiner's Death Scene Investigation Report was prepared by Parks on behalf of Wilson, Hunter, and Genesee County.

187. The report stated that the primary rationale for the investigation was a "Violent Death (Homicide)".

188. The report identifies Hurley Medical as the reporting agency.

---

[6] As will be discussed, despite not having received the autopsy until January of 2010, Forsteyk proceeded with the warrantless arrest of Plaintiff in October of 2009.

32

189.   The report stated that the investigator was notified of the homicide by Hurley Medical at 1:19 p.m. and that Coon was the officer on scene.

190.   The report identified Plaintiff as the person that caused Naviah's death.

191.   The report stated that Nolan was the witness of Naviah's death.

192.   The report acknowledged the existence of an old injury to Naviah's head and stated that Naviah's death should be considered non-accidental.

193.   According to police records purportedly generated on October 6, 2009, Wilson allegedly characterized Naviah's death as "Abusive head trauma – caused by blunt force. Shaking and striking…Blunt force trauma to head. Too much damage from shaking."[7]

194.   According to police records, Nolan informed the officers that Naviah's injuries were not caused from a fall but were the result of abuse by Plaintiff.

195.   According to Forsteyk's notes, Coon and Forsteyk had requested that Mom and Plaintiff voluntarily appear at the police station on October 23, 2009, but they failed to appear.

196.   According to Forsteyk's notes, on October 23, 2009, Coon presented a warrant to the prosecutor for the arrest of Plaintiff, and the warrant was approved.

---

[7] As will be discussed, in Wilson's January 2010 autopsy report she characterized the cause of death as being "Blunt Force Trauma", but after Nolan testified at Plaintiff's criminal trial admitting that no evidence existent to support a finding of "Blunt Force Trauma", Wilson sent the prosecution an "updated" autopsy report changing the cause of death to "Abusive Head Injury".

However, other police records indicate that by the time of Plaintiff's arrest (on October 26, 2009) the warrant was still pending.

197.   The warrant request dated October 23, 2009, submitted to the prosecution office was not supported by any probable cause to charge Plaintiff for the crimes he was being charged with. The only basis provided in support of the warrant request was (i) Griffin was the father; and (ii) Griffin's story did "not match evidence." The warrant request identified Coon, Forsteyk, Wilson and Nolan as the witnesses in support of the warrant request and stated that Nolan and Wilson provided statements in support of the request. The warrant request stated that the officers were "still awaiting neuropath and autopsy report[.]"

198.   According to Forsteyk's notes, on October 26, 2009, Forsteyk spoke with Mom and "advised her to come in at 2:00 pm" and Mom stated that both she and Plaintiff would be coming in.

199.   Upon arrival, Mom was interviewed. Upon information and belief, despite being recorded, Mom's interview was never shared with Plaintiff or his criminal defense counsel.

200.   According to police records, upon arrival, Coon and Forsteyk advised Plaintiff of his *Miranda* rights and after Plaintiff "refused to waive his right to have an attorney present and continue the interview", Plaintiff was arrested, lodged, and booked for Murder/Non-Negligent Manslaughter.

201.   According to police records, and contrary to Forsteyk's notes, at the time of the arrest, no warrant had been issued.

202.   According to other police records, at approximately 3:43 p.m. on October 26, 2009, a "warrantless" arrest was made of Plaintiff for Family-Abuse/Neglect Nonviolent-Cruelty Toward Child/Nonviolent.

203.   According to police records dated January 27, 2010, a warrant was issued by Genesee County on October 26, 2009.

**Wilson's Autopsy Report**

204.   In conducting her autopsy of Naviah, Wilson allegedly relied upon false evidence provided by Parks, Coon, Forsteyk, and the Hurley Medical Defendants.

205.   As part of her autopsy, Wilson allegedly reviewed Naviah's CT scans – the first of which revealed a cystic hygroma.

206.   Wilson's autopsy report noted the existence of a prior head injury, a purplish bruise on Naviah's face, and the occurrence of an unsuccessful craniotomy.

207.   Nevertheless, without any evidence that Naviah's injuries were caused by Plaintiff as opposed to being caused by the failed craniotomy, Wilson determined that the cause of Naviah's death was "Blunt Force Injury of the Head" and the manner of death was "Homicide".

208.   Wilson's autopsy report is dated January 11, 2010, and was provided to the prosecution via fax on January 13, 2010.

209.   According to the autopsy report, the autopsy occurred on October 1, 2009, at 9:00 a.m. and in the presence of Parks, a CPS worker (Nitasha Brown), and a representative from Hurley Medical (Dr. Bowling).

210.   According to her testimony at the preliminary examination, Wilson removed Naviah's brain and eyes and fixated them for several weeks before sending them out to Dr. Rudy Castellani for further evaluation.

211.   According to Wilson's testimony and notes, Wilson and Hunter allegedly sent Naviah's brain and eyes to Castellani 8 weeks after Naviah's death.

212.   According to Catellani, on December 9, 2009, Castellani received Naviah's brain and eyeballs with a small section of optic nerve attached, and a portion of Naviah's dura.

213.   While Castellani was able to confirm the existence of a neomembrane (and thus a cystic hygroma), Castellani was not provided everything he would have needed to evaluate that old injury.

214.   Nevertheless, Castellani conclusively determined that Naviah had sustained a prior head injury in the remote past that had healed and would have been especially susceptible to reinjury.

215.   Castellani provided his findings to Wilson and Hunter on December 11, 2009.

216. Contrary to industry standards, Naviah's brain, eyes, and accompanying evidence (including microscopic slides) were then destroyed.

217. Wilson's autopsy report (dated January 11, 2020) referred to Castellani's report. Yet, more than 7 months later (and while Plaintiff was in trial), Wilson and Hunter sent an altered autopsy report (allegedly in response to Castellani's report) to the prosecution which changed the "Cause of Death" from "Blunt Force Injury of the Head" to "Abusive Head Trauma".

218. This is not the first time that Wilson and Hunter modified an autopsy report at the direction of, and in coordination with, the police and prosecution. *See, e.g., People v. Harris,* 2024 WL 740709, at *2-4, 6, 10, 12 (Mich. Ct. App. 2024) (discussing Hunter's decision to change the manner of death from accidental to homicide to assist the prosecution and police obtain a conviction); *People v. McCovery,* 2022 WL 2903973, at * 8, 16 (Mich. Ct. App. 2022) (similar); *Id.* at n. 15 ("Dr. Hunter agreed that without additional information from the police, his classification would have been undetermined."); *People v. Williams,* 2015 WL 558307 (Mich. Ct. App. 2015) (discussing Wilson's decision to alter autopsy after the police informed her that a fire was *intentionally* set); *Williams v. Palmer,* 2017 WL 393385 at *5 (W.D. Mich. 2017) ("Wilson testified that she…changed the manner of death on the autopsy reports and death certificates *as a matter of routine practice to conform to the results of the police investigation of the fire.*"); *People v.*

*Cheatham,* 2023 WL 4539868 (Mich. Ct. App. 2023) (discussing Wilson's decision to change the cause of death after the fact);

219.    Nor is this the first time Wilson and Hunter have been accused of characterizing a death as homicide with insufficient evidence. *See, e.g., Porter v. Jackson,* 2017 WL 3149138 (E.D. Mich. 2017); *Reed v. Swanson,* 2022 WL 4598501, at *7 (E.D. Mich. 2022).

220.    In fact, both Wilson and Hunter have a known history of using the phrase "Abusive Head Injury" in order to assist the prosecution and police in obtaining a conviction. *See, e.g., People v. Miller,* 2004 WL 2534367 (Mich. Ct. App. 2004); *People v. Miller,* 2020 WL 4554873 (Mich. Ct. App. 2020); *People v. Miller,* 2021 WL 1326733 (Mich. Ct. App. 2021)

221.    Indeed, Hunter has long been a staunch advocate of using the phrase "Abusive Head Injury" without sufficient factual or scientific support. *See, e.g., People v. Ackley,* 497 Mich. 381, 384-87, 390-93, 397 (Mich. 2015); *People v. Ackley,* 2014 WL 1618356 (Mich. Ct. App. 2014).

222.    Similar, there is a well-documented history of the Hurley Medical Defendants utilizing the phrases "nonaccidental" or "abusive trauma" to assist the prosecution in criminal proceedings. *See, e.g., Zavoda v. Lafler,* 2005 WL 3008590 (E.D. Mich. 2005) (case involving Nolan's theory of child abuse to obtain a conviction against a father alleging that his daughter died as a result of malpractice

and medical undermanagement by Hurley Medical); *Lutze v. Sherry,* 2008 WL 2397640 (E.D. Mich. 2008) (discussing a criminal conviction partly due to Nolan's theory of abusive head injury); *Thibeault v. Hoffner,* 2017 WL 7421000 (W.D. Mich. 2017) (similar but involving Castellani)

223.    Thankfully, after many years of doctors and forensic pathologists unduly influencing the jury in criminal trials by utilizing terms such as "abusive" or "nonaccidental", the Michigan Supreme Court determined that the use of phrases like "Abusive Head Injury" in a criminal trial in which abuse and intent are at issue violates a criminal defendant's due process rights. *See People v. McFarlane,* 325 Mich. App. 507, 517-527 (2018) ("we conclude that in cases involving allegations of abuse, an expert goes too far when he or she diagnoses the injury as 'abusive head trauma' or opines that the inflicted trauma amounted to child abuse. The ordinary understating of the term 'abuse'—as opposed to neglect or carelessness—implies a level of willfulness and moral culpability that implicates the defendant's intent or knowledge when performing the act that caused the head trauma."); *Id.* at 524-525 (finding the use of "nonaccidental head trauma" to have similarly violated the criminal defendant's due process rights); *People v. McFarlane*, 505 Mich. 1059, (2020); *People v. Ackley,* 336 Mich. App. 586 (2021); *People v. Franks,* 2019 WL 4733082, at *8 (Mich. Ct. App. 2019); *Ceasor v. Ocwieja,* 655 Fed. Appx. 263 (6th Cir. 2016) (finding the theory of shaken baby syndrome – also known as the Abusive

Head Injury theory – to be unreliable); *See also, People v. Lemons,* 514 Mich. 485 (2024) (discussing the scientific history and evolution of the shaking baby syndrome and abuse head injury theories); *People v. Thigpin,* 2024 WL 2795775 (Mich. Ct. App. 2024) (same); *Shaver v. Hoffner,* 2025 WL 501263 (W.D. Mich. 2025) (similar).

**Preliminary Examination**

224. Genesee County charged Plaintiff with Felony Murder and Child Abuse in the First Degree.

225. A preliminary examination was held on November 9, 2009, February 3, 2010, and February 18, 2010.

226. During that preliminary examination, the prosecution relied on the fabricated evidence manufactured by Defendants to mislead the trial court into believing that probable cause existed to charge and prosecute Plaintiff for Felony Murder and Child Abuse in the First Degree.

227. Relying on fabricated evidence, both Wilson and Forsteyk provided false testimony at the preliminary hearing and in support of the prosecution.

228. At all relevant times, each Defendant knew that no probable cause existed to arrest, detain or prosecute Plaintiff for the charges of Felony Murder and Child Abuse in the First Degree.

**Plaintiff's Trial**

229.  Trial began on July 20, 2010.

230.  Forsteyk sat second chair throughout the trial.

231.  The prosecution called O'Broin as a witness.

232.  Relying on information admittedly provided to her by Casey, O'Broin falsely testified that Naviah's death was caused by nonaccidental trauma caused by Plaintiff.

233.  O'Broin admitted that her medical records (describing Naviah's injuries as being caused by nonaccidental trauma) were generated by O'Broin after O'Broin learned of the existence of a cystic hygroma on Naviah's brain.

234.  O'Broin admitted that her notes were inconsistent with the medical records prepared prior to discovering the existence of a cystic hygroma on Naviah's brain.

235.  O'Broin testified that the only reason she had for deeming Naviah's death to have been caused by nonaccidental trauma was that there was a "disconnect" between what Plaintiff and Mom stated and Naviah's injuries. O'Broin admitted that she never spoke to Plaintiff and Mom but relied on information provided by Casey.

236.  O'Broin stated that her job was to rule out non-accidental trauma and that she does that by speaking to the parents and comparing the parent's accounting to the CT scans and physical examination of Naviah.

237. But O'Broin did not speak to the parents, she did not observe any external injuries to Naviah, and the CT scan that O'Broin observed prior to deeming Naviah's death as caused by nonaccidental trauma revealed only a small, clinically insignificant bleed, along with a cystic hygroma.

238. O'Broin testified that after she and Casey discovered the existence of a cystic hygroma, there was a concern of reinjury to the old injury and surgery was discussed but opted against.

239. O'Broin testified that she relied on the neurosurgeon (Shah) when deciding against surgery and sending Naviah to the pediatric ICU for monitoring.

240. O'Broin admitted that she spoke with Flint Police but denied recalling what was discussed. According to O'Broin, her notes did not discuss her interactions with Flint Police because in trauma cases "it's so par for the course up at Hurley" for police and doctors to discuss patients.

241. O'Broin admitted that the first CT scan showed a "small" hematoma with no evidence of brain swelling, and while there was alleged concern of exacerbation, the Hurley Medical Defendants opted against operating.

242. O'Broin testified that the decision not to operate was made by Shah and she deferred to Shah.

243. Nolan testified next.

244.   According to Nolan, as of July 20, 2021, he had testified hundreds of times in critical care and child abuse cases, despite only having received a certification in child abuse earlier that year.

245.   Nolan testified that a non-accidental trauma is one where the child was struck or thrown against something deliberately.

246.   Nolan testified that Blunt-Force Trauma occurs when one takes an object and hits a child or uses a child to hit something. Nolan testified that he did not have any evidence to support allegations that Naviah's injuries were caused by blunt force.

247.   Nolan testified that the phrase "Abusive Head Trauma" is used to encompass more than Blunt-Force Trauma and is used when there is no way to determine how the injuries occurred.

248.   Nolan admitted that the term Abusive Head Trauma was used to reflect that the doctors did not know what happened to Naviah.

249.   Nolan testified that the first time he saw Naviah was several hours into surgery and he determined that her injuries were caused by Abusive Head Trauma because, at the time of surgery, Naviah had severe brain swelling, Naviah's brain could not be put back into her skull, and there was no explanation. According to Nolan, this would not have occurred from a fall from a swing, so it was proof that Naviah's injuries were caused by abuse.

250.    Nolan admitted that he did not speak with the parents before determining that Naviah's injuries were caused by abuse. Rather, Nolan testified that he made his determination by speaking with other doctors (presumably Casey and O'Broin).

251.    Nolan testified that even though he spoke to Naviah's parents after the failed craniotomy, he did not even ask them how Naviah's injuries occurred.

252.    Nolan falsely testified that Naviah had brain swelling when she was admitted to the hospital on September 30th.

253.    Nolan testified that Naviah died due to brain swelling.

254.    Trial continued on July 21, 2010.

255.    The prosecution called Casey to testify.

256.    Casey admitted that he was present during the first CT scan and was concerned about the existence of the right-sided cystic hygroma.

257.    Casey stated that, despite his concerns about the potential exacerbation of the cystic hygroma, he deferred to the radiologist.

258.    Casey testified that he contacted Shah and deferred to Shah about whether to treat or monitor Naviah.

259.    Casey testified that Shah did not believe anything needed to be done and that he deferred to Shah.[8]

---

[8] As will be discussed, Shah testified that he deferred to Casey.

260.   Casey testified that, when he spoke to Mom about Naviah's injury, he told Mom to stop speaking to him because her story was not consistent with his findings.

261.   Casey admitted that *after* Naviah was admitted her neurological condition "continued to deteriorate".

262.   Casey admitted that it was not until Naviah was in the pediatric ICU that there were signs that her brain was beginning to herniate.

263.   Casey testified that Shah did not come to Hurley Medical to see Naviah until the following morning.

264.   Casey testified that it was Shah that determined that surgery was needed the following morning.

265.   Casey testified that during Shah's craniotomy, Casey was called in because Naviah had developed cardiac problems and was not getting enough fluids.

266.   Casey testified that by the time he arrived, Shah had already removed Naviah's cranial cap and Naviah's brain had begun to mushroom out of her skull.

267.   Casey testified that Naviah had no pulsation in certain vessel and the doctors were "pretty convinced that the child was brain dead"

268.   Casey stated that as the admitting physician he was the captain of the ship.

269.   Casey falsely testified that Naviah's injuries were caused by nonaccidental trauma given the "major" hematoma that she came in with.

270.   Casey testified that the purplish bruise on Naviah's face indicated that she may have fallen a week prior but stated that he did not ask the parents about that bruise.

271.   Casey testified that Naviah's surgery occurred from 7:20 a.m. until 12:23 p.m.

272.   After Casey's testimony, and *during* Plaintiff's criminal trial, the prosecutor informed the trial court and Plaintiff's defense counsel that she had just received an updated autopsy report.

273.   According to records subsequently obtained by Plaintiff, on July 21, 2010, the Genesee County Medical Examiners' office faxed the prosecution a *new* autopsy report prepared by Wilson and Hunter. On the cover letter of the fax it stated, "Corrected Report w/ new Cause of Death." The amended autopsy report simply changed the Cause of Death from "Blunt Force Trauma" to "Abusive Head Injury"

274.   Parks was also called to testify.

275.   Parks testified that at the end of 2002, Genesee County decided to have a medical examiner scene investigator for the medical examiner's office and requested that the Sheriff's department designate personnel for this purpose.

276.   Parks testified that he went through a 10–12-week course and became a medical examiner scene investigator for the medical examiner's officer.

277.   Parks testified that his job was to attempt to determine the cause and manner of death and to determine whether a deceased should be sent to the medical examiner's office for an examination.

278.   Parks referred to himself as the eyes and ears of the pathologists.

279.   Parks testified that, as of July 2010, he had been "investigating" 250-300 deaths per year.

280.   Parks testified that his job entailed submitting reports to the pathologist for an autopsy to be conducted the next morning.

281.   Parks testified that he arrived at Hurley Medical at approximately 2 p.m. on October 1, 2009, where he spoke with Nolan and Casey.

282.   Parks testified he made contact with Mom and spoke to her for 20-30 minutes after which he returned to Naviah to prepare her for departure to the morgue.

283.   Parks falsely testified that he had then spoken with Mom again and Mom told Parks that Plaintiff had abused Naviah and had killed her.

284.   Parks testified that he prepared a medical examiner's report containing this (fabricated) evidence and submitted it the following day.

285.   Parks testified that, upon request from the prosecution, Parks submitted his second report to the prosecutor in May of 2010.

286.    Shah testified after Parks.

287.    Shah admitted that after Naviah's CT scan he was consulted over the phone.

288.    Shah testified that his decision of whether or not to visit Naviah was based upon the urgency of the situation described to Shah over the phone.

289.    Shah testified that he deferred to Casey and the doctors present to determine whether he should visit Naviah or if its "something that can wait"

290.    Shah testified that, at the time of his phone consultation, Naviah had "a small hemorrhage in the right frontal area" and "a tiny contusion and small subdural hematoma" which was "not clinically significant."

291.    Shah testified that when he later determined that surgery was needed, Shah made incisions into Naviah's head, removed a piece of the skull and opened the covering of the brain (the dura).

292.    Shah testified that he removed a hemorrhage and *after doing so* Naviah's brain began to swell uncontrollably, her pulse was going down, her blood pressure started to rise, and her brain started to change color due to lack of blood flow.

293.    Shah testified that Naviah then started to suffer from cardiovascular collapse and Casey was called in to attempt to get blood back into Naviah's brain and heart.

294.    Shah testified that Naviah's brain had begun swelling so much to the point where he was unable to place her cranial cap back on.

295.    Shah testified that he realized there was no point in trying to save or resuscitate Naviah and that he and Casey went to speak with Naviah's parents to convince them to agree to discontinue treatment.

296.    Shah testified that he was unable to state whether Naviah's injuries occurred before or during surgery.

297.    Trial continued on July 22, 2010.

298.    Wilson was called to testify for the prosecution.

299.    As of that date, Wilson had testified in approximately 50 other cases, many of which were on behalf of the prosecution.

300.    Wilson testified that the term "Abusive Head Trauma" was used to suggest traumatic head injury caused by shaking and striking a baby's head.

301.    Wilson testified that she had conducted the autopsy of Naviah on October 1, 2009, at 9:00 a.m.

302.    Wilson testified that she does not know when Naviah died or how much time elapsed between her death and Wilson's alleged autopsy.

303.    Wilson testified that the autopsy results were influenced by Parks and his and her discussions with Flint Police and the Hurley Medical Defendants.

304.    Wilson testified that her autopsy results were "guide[d]" by information she received from Parks, Flint Police, and the Hurley Medical Defendants.

305.    Wilson testified that during Naviah's surgery she was told that Naviah was not expected to survive.

306.    Wilson testified that by the time she received Naviah, Naviah's head was covered in blood-soaked bandages, that a piece of skull had been removed, and there were staples and cuts across her head.

307.    Wilson testified that she removed Naviah's brain and eyes and, after about 8 weeks, sent them to Castellani for review.

308.    Wilson testified that she knew of an old head injury but did not look for evidence relating to that prior injury.

309.    Wilson testified that after Castellani provided his findings, Wilson determined that the cause of death was "Abusive Head Injury" and the manner of death was "Homicide." However, Wilson's report which is dated one month after Castellani's report stated that the cause of death was "Blunt Force Trauma" and it was not until Wilson amended her report many months later that she changed the cause of death to "Abusive Head Injury."

310.    Wilson testified that her conclusion of Abusive Head Injury reflected that Naviah's injuries were caused by shaking and striking of Naviah's head with

blunt force, and that her findings demonstrate that Plaintiff was lying about how Naviah's injuries occurred.

311.   Wilson testified that she changed the report from Blunt Force Trauma to Abusive Head Injury after she received Castellani's report that identified the existence of a prior head injury (i.e. the neomembrane/cystic hygroma) and that Abusive Head Injury better reflected what happened to Naviah.

312.   Wilson admitted that none of the underlying injuries and analysis from her original autopsy report changed in her amended report. The only change was the cause of death.

313.   Wilson admitted that she was not able to determine whether the injuries she saw to Naviah's brain were caused by medical intervention or non-medical causes but that it was her opinion that they were caused by Plaintiff.

314.   After prosecution rested, Plaintiff took the stand.

315.   Plaintiff testified that he loved Naviah and loved caring for her.

316.   Plaintiff explained how he heard a thump and found Naviah face down on the hardwood floor and the events that transpired thereafter.

317.   On cross examination the prosecution asked Plaintiff questions about the involuntary statements he made when he was interrogated by Coon and Forsteyk.

318.   The prosecution told Plaintiff that his interrogation had been videotaped and asked Plaintiff questions relating to the involuntary statements made during that interrogation.

319.   The prosecution informed the jury of Plaintiff telling Coon and Forsteyk that he sometimes hits/taps Naviah on the head, that Plaintiff had reason to be upset with Mom, and that Plaintiff made other incriminating statements during his interrogation.

320.   The prosecution then called Coon.

321.   Through Coon, the prosecution told the jury about various false confessions and involuntary statements made by Plaintiff during the unlawful interrogation.

322.   A jury convicted Plaintiff of Felony Murder and Child Abuse in the First Degree.

323.   Plaintiff was sentenced to life in prison.

324.   On October 18, 2011, the Michigan Court of Appeal affirmed the conviction, largely relying on the fabricated and false evidence obtained by Defendants and utilized by the prosecution.

**After 14 years, Plaintiff is Exonerated**

325.   In May 2023, due to heroic efforts by the Michigan Innocence Clinic and Mike Morse Law Firm, Plaintiff was exonerated and his conviction was vacated.

326.   On September 13, 2023, all charges were dismissed against Plaintiff with prejudice.

327.   Plaintiff's tether was removed on September 14, 2023.

328.   As a result of Defendants' successful efforts to falsely arrest, maliciously prosecute and wrongfully convict Plaintiff, Plaintiff spent approximately 14 years detained and imprisoned for a crime he did not commit.

## COUNT I

**42 U.S.C. § 1983 –**
**Violation of Plaintiff's Fourth, Fifth, and Fourteenth Amendment Rights**
**All Defendants**

329.   Plaintiff incorporates by reference paragraphs 1 to 328, as fully set forth herein.

330.   At all relevant times, Defendants acted individually, jointly, and in concert, and under color of state law, as employees and/or agents of the City of Flint, Genesee County, and Hurley Medical Center, with the purpose and effect of depriving Plaintiff of rights secured by the Constitution of the United States, including those guaranteed by the Fourth, Fifth, and Fourteenth Amendments.

**A. Fabricated Evidence and False Reports (Fourth & Fourteenth Amendments)**

331.   Defendants Coon, Forsteyk, Parks, Wilson, Hunter, Casey, Nolan, and O'Broin deliberately fabricated facts in police reports, medical records, autopsy

findings, and testimony to create the false appearance that Plaintiff had abused and murdered his infant daughter.

332.    These Defendants knowingly misrepresented clinical findings, altered contemporaneous hospital notes, omitted exculpatory evidence (including the existence of a cystic hygroma and prior accidental injury), and inserted language asserting "non-accidental trauma", "abuse", and "homicide" without factual, medical, or forensic basis.

333.    Defendants Coon and Forsteyk authored police reports and summaries that falsely characterized Plaintiff's statements as confessions, omitted the coercive tactics used, and knowingly included fabricated admissions and involuntary statements they elicited through unconstitutional interrogation methods.

334.    Defendants Parks, Wilson, Hunter, and Nolan authored and relied upon falsified autopsy and investigative reports and intentionally attributed the infant's injuries to "blunt-force" or "abusive head trauma," despite contemporaneous evidence that the death resulted from a failed craniotomy and medical error.

335.    The deliberate fabrication and use of these false reports, coupled with the suppression and destruction of contradictory evidence, caused Plaintiff to be falsely arrested, charged, maliciously prosecuted, and wrongfully convicted, in violation of his right to be free from unreasonable seizure and deprivation of liberty without due process of law.

336.   Defendants knowingly and intentionally caused Plaintiff to be arrested and charged with crimes that were not supported by probable cause.

337.   Defendants knowingly and intentionally caused Plaintiff to be detained, prosecuted, and imprisoned for charges brought and sustained without probable cause.

## B. Coerced Confession and Self-Incrimination (Fifth & Fourteenth Amendment)

338.   Defendants Coon and Forsteyk subjected Plaintiff to a prolonged, custodial interrogation in the middle of the night while he was a 19-year-old high-school dropout, isolated, sleep-deprived, emotionally distraught, and without counsel or *Miranda* warnings.

339.   During the interrogation, Defendants falsely told Plaintiff that doctors refused to treat his child unless he confessed, threatened the loss of his parental rights, implied that his daughter's life depended on his confession, and suggested that he would never see her again unless he provided a false confession.

340.   Under this extreme psychological coercion and duress, Plaintiff uttered statements that were involuntary, false, and mischaracterized.

341.   Defendants knowingly recorded, summarized, transcribed, and used these involuntary statements to falsely arrest, maliciously prosecute, and wrongfully convict Plaintiff.

342.   By compelling statements through threats and deceit, and by causing those statements to be used against Plaintiff in a criminal proceeding, Defendants violated Plaintiff's privilege against self-incrimination under the Fifth Amendment, and his substantive and procedural due-process rights under the Fourteenth Amendment.

## C. Unreasonable Seizure and Deprivation of Liberty (Fourth & Fourteenth Amendments)

343.   On or about October 26, 2009, Defendants Coon and Forsteyk caused Plaintiff to be seized and arrested without a warrant and without probable cause. The only information supporting the arrest was the fabricated evidence, coerced statements, and falsified medical conclusions described above.

344.   Defendants knew or should have known that their reports and testimony were false, that exculpatory medical data contradicted their assertions, and that no probable cause existed to believe Plaintiff committed any crime.

345.   Each Defendant knew that no probable cause existed to arrest, detain, and imprison Plaintiff, and each Defendant knew that false evidence was being manufactured by the other Defendants to secure a wrongful conviction. Yet, each Defendant made a conscious decision to not intervene and prevent the resulting constitutional violations.

346.   The unlawful arrest, detention, and subsequent malicious prosecution deprived Plaintiff of liberty for approximately fourteen years and violated his rights

under the Fourth and Fourteenth Amendments to be free from unreasonable seizure and deprivation of liberty without due process.

347. Defendants conduct was intentional, malicious, reckless, and performed with deliberate indifference to Plaintiff's constitutional rights.

348. As a direct and proximate result, Plaintiff suffered loss of liberty, physical and emotional distress, humiliation, reputational harm, loss of family relationships, and economic damages associated with fourteen years of wrongful incarceration.

**WHEREFORE**, Plaintiff seeks judgment against Defendants for compensatory damages, including non-economic and economic damages; punitive damages; costs and attorney fees; and any other relief this Court deems just and equitable.

## COUNT II

### 42 U.S.C. § 1983 Conspiracy
### All Defendants

349. Plaintiff incorporates by reference paragraphs 1 to 328, as fully set forth herein.

350. At all relevant times, Defendants—acting under color of state law as officers of the Flint Police Department, employees of Hurley Medical Center, agents of the Genesee County Medical Examiner's Office, and participants in a coordinated law-enforcement/medical task force—entered into an agreement, express or implied,

to deprive Plaintiff of rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments.

351. The object of the conspiracy was to manufacture probable cause, deprive Plaintiff of due process, secure a wrongful conviction, and shield the true causes of an infant's death by fabricating evidence, coercing false statements, and concealing exculpatory facts.

352. In furtherance of the conspiracy, Defendants committed overt acts, including but not limited to:

   a. Fabricating police reports, transcripts, and testimony that misrepresented Plaintiff's statements and contained involuntary, and false confessions;

   b. Withholding, concealing, and destroying the audio and video recordings of Plaintiff's interrogation to conceal coercive tactics;

   c. Failing to preserve exculpatory evidence including Naviah's brain, eyes, and related testing results;

   d. Creating false medical documentation characterizing the infant's injuries as "non-accidental trauma" and "abusive head injury" despite contrary factual, radiological, and clinical evidence;

e. Issuing an autopsy report that misstated the date, time, and cause of death, and later altering that report to conform to police and prosecution theories of homicide;

f. Preparing falsified scene-investigation and death reports falsely asserting that the mother accused Plaintiff of abuse;

g. Communicating and coordinating false narratives among police, physicians, and medical-examiner staff to ensure consistent false testimony attributing death to abuse rather than medical error; and

h. Providing perjured testimony at Plaintiff's preliminary examination and criminal trial to sustain the fabricated charges and secure a conviction.

353. Each individual Defendant knowingly agreed to, and did, participate in the scheme and acted with the shared intent that Plaintiff would be unlawfully seized, prosecuted, and imprisoned based on fabricated evidence and coerced statements.

354. There is a well-documented history of these individual Defendants working with one another to create a case of abuse against individuals. *See, e.g., Branch v. Smith,* 2015 WL 4075085 (E.D. Mich. 2015) (Forsteyk and Wilson); *Hopson v. MacLaren,* 2018 WL 3390402 (E.D. Mich. 2018) (Coon and Hunter); *In re Johnson/Clements*, 2020 WL 703569, at *2 (Mich. Ct. App. Feb. 11, 2020) (Hunter and Nolan)

355.   Defendants' concerted actions resulted in Plaintiff's warrantless arrest, prosecution without probable cause, conviction upon falsified evidence, and imprisonment for fourteen years, all in violation of his rights to be free from unreasonable seizure, compelled self-incrimination, and deprivation of liberty without due process of law.

356.   The conspiracy described herein was the moving force behind Plaintiff's injuries, including the loss of liberty, mental and emotional distress, humiliation, loss of familial association, reputational harm, and economic losses.

357.   Defendants acted willfully, wantonly, maliciously, and with reckless disregard for Plaintiff's constitutional rights.

**WHEREFORE**, Plaintiff seeks judgment against Defendants for compensatory damages, including non-economic and economic damages; punitive damages; costs and attorney fees; and any other relief this Court deems just and equitable.

## COUNT III

### 42 U.S.C. § 1983
### *Monell* Liability

358.   Plaintiff incorporates by reference paragraphs 1 to 328, as fully set forth herein.

359.   Before and during the events described herein, the City of Flint and Genesee County jointly operated and supervised the Flint Police Department, the

Hurley Medical Center, the Genesee County Sheriff's Department, and the Genesee County Medical Examiner's Office. This cooperative structure was formalized through joint task forces and through routine cross-communication protocols between police investigators, physicians, and medical-examiner staff. The ostensible purpose of this collaboration was to expedite investigations of child injuries and unexplained deaths; in practice, it fostered a systemic culture of confirmation bias, evidentiary fabrication, and medically unsound forensic determinations designed to secure criminal prosecutions.

360.   Within this system, Flint officers—including Defendants Coon and Forsteyk—regularly collaborated with Hurley physicians (Casey, Nolan, and O'Broin) and Genesee County medical-examiner personnel (Wilson, Hunter, Parks) in cases involving alleged child abuse or unexplained trauma. The City and County encouraged their respective agents to treat medical findings as extensions of police investigations rather than independent clinical determinations. This pattern produced predictable constitutional violations: coercive interrogations, suppression of exculpatory evidence, and falsified autopsy conclusions tailored to match law-enforcement theories.

361.   Despite numerous prior incidents in which Flint officers or Genesee County medical staff were accused of coercing confessions or issuing questionable "non-accidental" findings, neither entity implemented corrective policies, auditing

procedures, or training to safeguard the constitutional rights of suspects and families. Their deliberate indifference to the foreseeable risks created by this integrated investigative model directly enabled the misconduct that caused Plaintiff's unlawful seizure, prosecution, and fourteen-year wrongful detention.

## A. City of Flint – Policy and Custom of Fabricating Evidence and Coercive Interrogation

362.    Defendant City of Flint, through its Department of Public Safety and supervisory officials, maintained a longstanding policy, pattern, and practice of:

a.   Conducting custodial interrogations without proper *Miranda* warnings;

b.   Employing psychological coercion and threats to obtain false confessions, particularly from youthful or vulnerable suspects;

c.   Failing to adequately train its officers to ensure they respect the dignity and rights of suspects;

d.   Failing to adequately train its officers to ensure they conduct investigations in an unbiased and independent manner;

e.   Creating, altering, or omitting material facts in investigative reports to support predetermined theories of guilt; and

f.   Suppressing, concealing, or destroying audio and video recordings to conceal the coercive nature of interrogations.

363.   These customs and practices were so pervasive and permanent as to constitute a de facto policy of the City of Flint, reflecting deliberate indifference to the constitutional rights of individuals investigated by its officers.

364.   At the time of Plaintiff's arrest and interrogation, the City knew that its officers—including Defendants Coon and Forsteyk—had engaged in prior misconduct involving coercive questioning and falsified reports, yet failed to discipline, train, or supervise them.

365.   Indeed, as early as 2008, the City was aware of concerns that Forsteyk and Coon were unqualified and a threat to public safety. *See, e.g., Gaspar v. Dicks,* 2010 WL 5462546 (E.D. Mich. 2010) (case challenging Forsteyk's 2008 promotion); *Sprague v. Forystek,* 2007 WL 2812300 (E.D. Mich. 2007) (case involving alleged constitutional violations by Forystek); *Mark v. City of Flint,* 2014 WL 667515 (Mich. Ct. App. 2014) (same).

366.   The City's policymakers—including its Chief of Police, Internal Affairs supervisors, and City Attorney—ratified these unconstitutional methods by approving or acquiescing in fabricated reports, warrant requests, and prosecutions lacking probable cause.

367.   The City's failure to establish adequate policies, oversight, or accountability directly caused the violation of Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights, as those deficiencies enabled and encouraged the

unlawful interrogation, false confession, and fabricated evidence that led to his arrest, prosecution, and wrongful conviction.

**B. Genesee County – Policy and Custom of Fabricated Medical Records and Autopsies and Coordination of Law Enforcement**

368.   Defendant Genesee County, acting through its Medical Examiner's Office and contracted pathologists, maintained a policy and custom of collaborating with law enforcement to support prosecutions by tailoring autopsy findings to police theories, regardless of medical evidence.

369.   This practice included routinely amending or modifying autopsy reports at the request of police or prosecutors, classifying ambiguous or iatrogenic (medically caused) injuries as "homicide" or "abuse," and disregarding exculpatory medical findings.

370.   The County was aware of the pattern and practice of Hurley's doctors and County Medical Examiners utilizing terms such as "nonaccidental" and "Abusive Head Trauma" without sufficient factual or medical basis and in order to assist police and prosecutors in securing convictions, irrespective of truth.

371.   The County routinely permitted, authorized, and encouraged Hurly Hospital, County officers, and pathologists to work in collaboration with one another (rather than independently) so to ensure a cohesive narrative could be used by police and prosecutors to secure convictions, irrespective of truth.

372. The County knew that such policies and practices were likely to, and did, result in the deprivation of constitutional rights of criminal defendants.

373. Genesee County officials—including Defendants Wilson, Hunter, and Parks—operated without meaningful oversight, training, or separation of duties from one another or the Flint Police Department. The County failed to implement policies to ensure scientific and investigatory independence, documentation integrity, or chain-of-custody protections for autopsy evidence, despite knowledge that its medical-examiner staff routinely worked hand-in-glove with law enforcement to secure convictions.

374. The County's deliberate indifference is also evidenced by its tolerance of repeated instances where medical-examiner staff issued altered or contradictory autopsy reports at the direction of police or prosecutors, including the two separate autopsy reports issued in Plaintiff's case with conflicting causes of death ("Blunt Force Trauma" vs. "Abusive Head Trauma").

375. Further, the County has long been aware of concerns that Parks was unqualified and a threat to public safety. *See, e.g., Robinson v. Genesee Cnty. Sheriff's Dep't*, 2017 WL 3479511, at *3 (E.D. Mich. Aug. 14, 2017) ("the allegation that Defendant Park was discharged after chronic mistreatment of inmates was discovered is exceedingly relevant. If true, that allegation suggests that there was a pattern and practice of mistreatment in the jail which Parks had already been found

(at least partially) responsible for."); *Wheeler v. Tocarchick*, 2016 WL 3611878, at *3 (E.D. Mich. July 6, 2016)

376.  By failing to train, supervise, or discipline its officers or medical-examiner personnel, and by maintaining a policy of coordination with law enforcement to secure criminal charges, Genesee County created an environment in which fabrication of medical evidence and false testimony were foreseeable and inevitable.

377.  The unconstitutional policies, customs, and failures to train or supervise described above were the moving force behind the constitutional violations suffered by Plaintiff, including:

    a.  The fabrication of medical and forensic evidence;

    b.  The suppression and destruction of exculpatory material;

    c.  The coercion of involuntary statements and false confessions;

    d.  The initiation of criminal charges without probable cause; and

    e.  The wrongful conviction and fourteen-year imprisonment of an innocent man.

378.  The acts of Defendants Coon, Forsteyk, Parks, Wilson, Hunter, Casey, Nolan, and O'Broin were undertaken pursuant to, and enabled by, the policies and customs of their respective employers, including the City of Flint, Genesee County, and Hurley.

379.    Accordingly, the City of Flint and Genesee County are directly liable under 42 U.S.C. § 1983 for maintaining and enforcing unconstitutional policies, practices, and customs that caused the deprivation of Plaintiff's constitutional rights.

**WHEREFORE**, Plaintiff seeks judgment against the Defendants for compensatory damages, including non-economic and economic damages; punitive damages; costs and attorney fees; and any other relief this Court deems just and equitable.

## COUNT IV

### Gross Negligence in Violation of MCL § 691.1407
### All Individual Defendants

380.    Plaintiff incorporates by reference paragraphs 1 to 328, as fully set forth herein.

381.    The events giving rise to this action occurred within a joint investigative and medical response network operated by the City of Flint, Hurley Medical Center, and the Genesee County Medical Examiner's Office. This inter-agency operation blurred the boundaries between police investigation and medical science, allowing law-enforcement officers, treating physicians, and forensic personnel to act interchangeably rather than independently. As a result, clinical care, forensic pathology, and criminal investigation were susceptible and corrupted by groupthink and confirmation bias.

382.    Within this system, police officers relied on medical staff for accusatory opinions, while medical professionals deferred to law enforcement for causation narratives. None of the Defendants exercised independent professional judgment or verified the reliability of the information they relayed to one another. Their mutual deference, haste, and disregard for accuracy led to the reckless fabrication of evidence that ultimately cost Plaintiff fourteen years of wrongful detention.

383.    The combined failures of these Defendants constitute conduct so reckless as to demonstrate a substantial lack of concern for whether injury would result, satisfying the statutory definition of gross negligence under Michigan law.

384.    At all relevant times, each Defendant acted during the course of their employment or contractual engagement with the City of Flint, Hurley Medical Center, or Genesee County, and each owed a duty under Michigan law to act with due care so as not to endanger the life, liberty, or safety of others.

385.    Under MCL § 691.1407(2)(c), governmental employees are not immune from tort liability when their conduct amounts to gross negligence, meaning behavior so reckless as to demonstrate a substantial lack of concern for whether an injury results.

386.    Defendants Coon and Forsteyk owed Plaintiff a duty to conduct a fair, lawful, and objective investigation.

387.    Instead, they:

a. Ignored clear factual and medical evidence suggesting an accidental injury;

b. Coerced involuntary statements and false confessions from a nineteen-year-old in a prolonged, custodial interrogation without counsel or *Miranda* warnings;

c. Threatened Plaintiff with the loss of his parental rights and his daughter's medical treatment;

d. Falsified or omitted material facts in police reports and warrant applications; and

e. Withheld or destroyed the video and audio recordings of the interrogation.

388.    These acts and omissions were not simple negligence but grossly negligent, showing a willful disregard for Plaintiff's constitutional and physical well-being and a conscious indifference to the truth.

389.    Defendants Casey, Nolan, and O'Broin owed a duty to provide competent medical care to Naviah, to record and communicate accurate findings, and to refrain from misrepresenting clinical information to law enforcement.

390.    These Defendants instead:

a. Failed to properly diagnose or treat a known cystic hygroma and concealed its significance;

b. Altered or approved false hospital records labeling the injury as "non-accidental trauma" without any factual or medical basis;

c. Manufactured evidence of abuse against Plaintiff so to frame Plaintiff and avoid potential malpractice liability; and

d. Shared falsified and unsubstantiated conclusions with police officers knowing they would be used to incriminate Plaintiff.

391.   Their conduct—particularly the decision to mischaracterize medical data and to align their records with police demands—was so reckless as to demonstrate a substantial lack of concern for whether injury would result, satisfying Michigan's definition of gross negligence.

392.   Defendants Wilson, Hunter, and Parks owed duties of independence, scientific integrity, and accuracy in determining the cause and manner of death.

393.   These Defendants breached those duties by:

a. Failing to verify the timing of the autopsy or the authenticity of medical records;

b. Issuing false and inconsistent autopsy reports listing the death as "Homicide" and later altering the cause to "Abusive Head Trauma" at the request of police and prosecutors;

c. Fabricating a narrative that the child's mother had accused Plaintiff of abuse;

    d.  Destroying or failing to preserve physical evidence, including brain tissue, eyes, and slides; and

    e.  Providing sworn testimony known to be inaccurate, false, and incomplete.

394.  This conduct represents more than mere error in medical judgment—it was gross negligence, evidencing a profound disregard for the foreseeable consequences to Plaintiff, who was arrested, convicted, and imprisoned based upon their reckless misrepresentations.

395.  The grossly negligent acts and omissions of each Defendant were the proximate cause of Plaintiff's injuries, including his wrongful arrest, prosecution, conviction, and fourteen-year incarceration, as well as severe emotional distress, humiliation, reputational harm, and financial loss.

396.  Each Defendant's actions, independently and collectively, displayed a substantial lack of concern for whether Plaintiff's constitutional and personal rights would be destroyed.

**WHEREFORE**, Plaintiff seeks judgment against Defendants for compensatory damages, including non-economic and economic damages; punitive damages; costs and attorney fees; and any other relief this Court deems just and equitable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Michael Griffin, respectfully requests that this Honorable Court enter judgment in his favor and against all Defendants, jointly and severally, and award the following relief:

1. Compensatory Damages in an amount to be determined at trial, for the loss of liberty, physical and emotional suffering, humiliation, loss of familial relationships, reputational injury, and economic harm sustained as a direct and proximate result of Defendants' unlawful acts and omissions;

2. Punitive and Exemplary Damages against each individual Defendant, in an amount sufficient to punish and deter similar misconduct, pursuant to 42 U.S.C. § 1983 and Michigan common law;

3. Declaratory Relief declaring that Defendants' conduct violated Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and under Michigan law;

4. Attorneys' Fees and Costs pursuant to 42 U.S.C. § 1988, together with all taxable costs and expenses of this action;

5. Pre-Judgment and Post-Judgment Interest as allowed by law;

6. Expungement and Correction of all official records and reports created, maintained, or disseminated by Defendants that falsely accuse Plaintiff of criminal conduct;

7. Such other and further legal and equitable relief as this Court deems just, proper, and necessary to restore Plaintiff to the position he would have occupied absent Defendants' unconstitutional and grossly negligent acts.

Respectfully submitted,

*/s/ Adam S. Akeel*
**AKEEL & VALENTINE, PLC**
SHEREEF H. AKEEL (P54345)
ADAM S. AKEEL (P81328)
DANIEL W. CERMAK (P84460)
Attorneys for Plaintiff
888 W. Big Beaver Road., Suite 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
adam@akeelvalentine.com
daniel@akeelvalentine.com

DATED: November 11, 2025

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL GRIFFIN,

                Plaintiff,

                                                Case No.   25-13615
v.                                              Judge:

CITY OF FLINT; GENESEE COUNTY;
TERRY COON; DAVID FORSTEYK;
GERALD PARKS; SAMANTHA O'BROIN;
BRIAN NOLAN; GREGORY CASEY;
ALLECIA WILSON; BRIAN HUNTER;
HURLEY MEDICAL CENTER

                Defendants.

_____

SHEREEF H. AKEEL (P54345)
ADAM S. AKEEL (P81328)
DANIEL W. CERMAK (P84460)
Akeel & Valentine, PLC
*Attorneys for Plaintiff*
888 W. Big Beaver Rd., Ste. 350
Troy, MI 48084-4736
(248) 269-9595
shereef@akeelvalentine.com
adam@akeelvalentine.com
daniel@akeelvalentine.com

_____

**JURY DEMAND**

_____

74

NOW COMES Plaintiff, MICHAEL GRIFFIN, by and through his undersigned counsel, Akeel & Valentine, PLC, and hereby demands a Trial by Jury of the above-referenced causes of action.

Respectfully submitted,

*/s/ Adam S. Akeel*
**AKEEL & VALENTINE, PLC**
SHEREEF H. AKEEL (P54345)
ADAM S. AKEEL (P81328)
DANIEL W. CERMAK (P84460)
Attorneys for Plaintiff
888 W. Big Beaver Road., Suite 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
adam@akeelvalentine.com
daniel@akeelvalentine.com

DATED: November 13, 2025